## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| |
|---|
| **In re** |
| **PETER AND JEAN SHAW,** |
| **Debtors** |

**Chapter 11**
**Case No. 09-18648-FJB**

### MEMORANDUM OF DECISION ON
### DEBTORS' OBJECTION TO CLAIM OF IRS
### AND ON
### MOTION OF IRS FOR PAYMENT OF ADMINISTRATIVE TAXES

From 2003 through 2010, the chapter 11 debtors, Peter and Jean Shaw, owned second and third homes—a beach house on Nantucket and a condominium in Warren, Vermont—that they attempted to rent for income but that yielded only losses.  When, in 2003 and succeeding tax years, they sought to mitigate those losses by taking federal income tax deductions for the properties' substantial expenses against Peter's unrelated earnings, the IRS disallowed the deductions.  The disallowance left the Shaws facing substantial tax claims, in response to which, in 2009, they filed a petition for relief under chapter 11.  In the bankruptcy case, the Internal Revenue Service ("IRS") filed a proof of claim for tax years 2003 through 2008 and a request for payment of postpetition taxes for 2009 and 2010, asserting total tax arrears in excess of $310,000.  The Shaws have objected to both, disputing, as to each year, the applicability of various limitations on the deductibility of the rental expenses.  After an evidentiary hearing, the Court now enters the following findings and rulings.[1]

---

[1] A table attached in the Appendix sets forth details, by year and by property, of the IRS's claims and requests for payments, of the performance of the rental businesses in the years in question, and of the Shaws' positions as to hours Jean expended each year, both in general and at the properties, and as to the days she spent at each property.

**Procedural History**

On September 10, 2009, Peter and Jean Shaw filed a joint petition for relief under chapter 11 of the Bankruptcy Code.  On November 3, 2009, the United States, by and through the IRS, filed a proof of claim, Claim 4-1, for secured and priority and nonpriority unsecured income tax debt for tax years 2003 through 2008.  The IRS has since filed four amendments to that proof of claim.  On October 27, 2011, the IRS filed the third amendment, Claim 4-4, for taxes totaling $216,803.42; and, with Claim 4-4, the IRS filed a request for payment of federal income taxes totaling $94,151.03 for tax years 2009 and 2010 as administrative expenses (the "Request for Payment").  The amounts of Claim 4-4 and of the Request for Payment are based on determinations by the IRS that, with respect to each tax year from 2004 through 2010, Jean Shaw did not spend 750 hours performing services as a real estate professional, and therefore the passive activity loss rule prohibits the deduction of the Shaws' net losses from rental activities from Peter's unrelated income.[2]

On November 10, 2011, the Shaws filed an objection ("the Objection") to Claim 4-4 and to the Request for Payment.  In the Objection, the Shaws (i) dispute the amount of the tax due for each tax year, 2003 through 2010, and (ii) ask the Court to determine under 11 U.S.C. § 506(a) that no portion of the claim is secured, because the value of the IRS's interest in the estate's interest in the property that secures the secured portion of Claim 4-4 is $0.  After the Shaws filed their objection, the IRS filed a further amended proof of claim, Claim 4-5, in which it reduced its claim for tax year 2004 from $3,332.74 to $0 and thus removed that year from contention.[3]

---

[2] I understand the IRS to have allowed the deduction of these expenses from rental income only.  The issue is whether rental expenses *in excess of rental income* may be used *against non-rental income*.

[3] Claim 4-5 is in all other respects identical to Claim 4-4.

The primary basis of the Shaws' objection to the amount of the claim is their contention that, for each tax year from 2005[4] through 2010, they are entitled to deductions against Peter's income for some or all of their rental expenses.  By agreement between the parties, the adjudication of the amount due has been bifurcated.  In the first phase, the parties are now seeking from the Court a determination as to whether or not the Shaws have satisfied the conditions in the relevant sections of the Internal Revenue Code for deduction of their rental expenses.  After the Court has made its determination, the IRS will recalculate the amount due in a manner consistent with the Court's rulings.  If the Shaws agree with the recalculation, orders will enter accordingly on the Shaw's Objection to Claim and the IRS's Request for Payment.  If the Shaws do not agree with the recalculation, the parties may seek the Court's intervention to decide any further, derivative dispute.

The Court has now held a three-day evidentiary hearing to determine (i) whether the Shaws have satisfied the statutory conditions for deduction of their rental expenses for tax years 2005 through 2010 and (ii) the value of the IRS's interest in the estate's interest in the property that secures the secured portion of Claim 4-4.  The former consumed the vast majority of the hearing.  After the hearing, the parties submitted proposed findings of fact and conclusions of law.

Regarding the deductibility issues, the Court will set forth the relevant law more fully below.  At this juncture it suffices to identify the specific factual issues as to which the parties presented evidence and are seeking findings from the Court.

The first set of issues is whether, as to each year and each property in issue, the Shaws' rental activity was "an activity engaged in for profit" within the meaning of 26 U.S.C. § 183 and the regulations applying it.  Section 183 effectively limits deductions for activities not engaged in for profit to the

---

[4] Though they had previously indicated otherwise, the Shaws have made clear (in their trial brief at p. 9) that the deductibility of rental expenses for 2003 is not in controversy because, in prepetition litigation before the United States Tax Court as to that tax year (and that year alone), an agreed judgment entered that resolved the deductibility issues in the Shaws' favor, and the IRS's claim for tax year 2003 is consistent with that resolution. Consistent with this position, the Shaws have submitted no proposed findings or conclusions as to 2003.

amount of income derived from the activity.  The IRS maintains that, in view of the huge costs of both

the Nantucket and Vermont properties and the paltry income they generated, it is not plausible that the

Shaws held these properties to generate rental profits.  The Shaws maintain that they purchased the

Nantucket property and, in 2009 and 2010, owned the Vermont condo solely to rent these to the public

for profit and therefore that their ownership of these properties was a for-profit activity and, as such,

not subject to § 183.

The second set of issues arises under 26 U.S.C. § 469.  This section disallows the deduction of

net losses from "passive activities," and it defines passive activity to include any rental activity unless,

among other things,

> (i) more than one-half of the personal services performed in trades or
> businesses by the taxpayer during such taxable year are performed in
> real property trades or businesses in which the taxpayer materially
> participates, and
>
> (ii) such taxpayer performs more than 750 hours of services during the
> taxable year in real property trades or businesses in which the taxpayer
> materially participates.
>
> In the case of a joint return, the requirements of the preceding sentence
> are satisfied if and only if either spouse separately satisfies such
> requirements.

26 U.S.C. § 469(c)(7)(B)(i) and (ii).  The Shaws acknowledge the applicability of these requirements but

contend that Jean has satisfied both for each year except 2008, in which she satisfied only the first but

not the second—a concession that effectively removes 2008 from contention.  The IRS contends that

Jean has not satisfied either requirement for any year.  Accordingly, the court must decide, for each tax

year in issue, (1) whether more than one-half of the personal services performed in trades or

businesses by Jean during such taxable year were performed in real property trades or

businesses in which Jean materially participated and (2) whether Jean performed at least 750 hours

of service in real property trades or businesses in which she materially participated.

The third set of issues arises under 26 U.S.C. § 280A.  The IRS maintains that if the deduction of net losses from non-rental income is not wholly disallowed by § 469 or § 183, then it is at least limited by § 280A because the Shaws made personal use of the rental properties.  The IRS contends that § 280A(e)(1) limits the deductibility of expenses for rental property of which a taxpayer made personal use in a given tax year to that fraction of the expenses that equals the number of days on which the property was rented at fair market value divided by the total number of days of the property's use.  This argument requires a determination, for each property and year in issue, of (i) whether the Shaws made personal use of the property for at least one day and, if so, (ii) the number of days the property was rented at fair market value and (iii) the total number of days the property was used.  The Shaws contend that, aside from three days of personal use of the Nantucket house in 2009, they made no personal use of their rental properties.

The fourth and last set of issues concerns the deductability of legal expenses the Shaws incurred in 2009 and 2010 in conjunction with their bankruptcy filing.  The Shaws deducted these expenses as an expense of their rental business; the IRS disallowed the deduction as a rental expense but allowed it as a personal expense.  As a personal expense, it is subject to a cap that effectively denies to the Shaws some or all benefit of the deduction.  The Shaws object to this reclassification.  The court must therefore determine whether the professionals' bankruptcy-related fees were incurred in furtherance of the Shaws' rental business.

**Jurisdiction**

The matters before the court are an objection to claim and a motion for payment of postpetition taxes as administrative expenses.  Both matters arise under the Bankruptcy Code[5] and in a bankruptcy case and therefore fall within the jurisdiction given the district court in 28 U.S.C. § 1334(b)

---

[5] See 11 U.S.C. §§ 501 (permitting the filing of proofs of claim), 502 (objections to proofs of claim), and 503 (permitting the filing of requests for payment of administrative expenses).

and, by standing order of reference,[6] referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).

Both matters are core proceedings within the meaning of 28 U.S.C. § 157(b)(1).[7]  Under these statutes

and under 11 U.S.C. § 505(a) (subject to certain exceptions, the court may determine the amount or

legality of any tax), the bankruptcy court has authority to enter final orders on the Objection and the

Request for Payment.

**Burden of Proof**

A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy

Procedure constitutes prima facie evidence of the validity and amount of the claim.  Fed. R. Bankr. P.

3001(f); see also *Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.),* 993 F.2d 915, 925 (1st Cir.

1993).  In order to rebut this prima facie evidence, the objecting party must produce "substantial

evidence."  *United States v. Clifford (In re Clifford),* 255 B.R. 258, 262 (D. Mass.2000), citing *Hemingway*

*Transport,* 993 F.2d at 925.  If the objecting party produces substantial evidence and thereby rebuts the

prima facie evidence, the burden is restored to the party on whom it would lie outside of bankruptcy.

"[T]he burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to

the burden of proof that normally comes with it."  *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20,

120 S.Ct. 1951, 1955 (2000).  "[T]he [Bankruptcy] Code makes no provision for altering the burden on a

tax claim, and its silence says that no change was intended."  *Id*., 530 U.S. at 21, 120 S.Ct. at 1956.

Outside of bankruptcy, where a taxpayer challenges a determination of tax deficiency, "a

deficiency notice carries a presumption of correctness requiring the taxpayer to prove by a

preponderance of the evidence that the Commissioner's determination was erroneous."  *Andrew Crispo*

*Gallery*, 16 F.3d 1336, 1341 (2d Cir. 1994)), citing *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78

L.Ed. 212 (1933).  Likewise, the burden of clearly showing the right to a claimed deduction rests in the

---

[6] The order of reference is codified in the district court's local rules at L.R. 201, D. Mass.

[7] See 28 U.S.C. § 157(b)(2)(A), (B) (core proceedings include proceedings concerning the administration of the estate, the allowance or disallowance of claims against the estate, and determinations of the validity, extent, or priority of liens).

first instance on the taxpayer.  *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84, 112 S.Ct. 1039, 117

L.Ed.2d 226 (1992); *IRS v. Official Committee of Unsecured Creditors (In re Industrial Commercial*

*Electrical, Inc.)*, 319 B.R. 35, 55 (D. Mass. 2005).  However, under § 7491(a) of the Internal Revenue

Code, "if, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual

issue relevant to ascertaining the liability of the taxpayer for any tax imposed . . . , the Secretary shall

have the burden of proof with respect to such issue."  26 U.S.C. § 7491(a).  The IRS does not dispute that

§ 7491(a) applies to the Shaws in this proceeding.  The effect of this subsection, which is applied on an

issue-by-issue basis, is to shift the burden of proof on a particular issue to the IRS upon the taxpayer's

introduction of credible evidence for its position on that issue.  "'[C]redible evidence,' for purposes of

interpreting and applying § 7491(a)(1), is 'the quality of evidence which, after critical analysis, the court

would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted

(without regard to the judicial presumption of IRS correctness)."  *Griffin v. C.I.R.*, 315 F.3d 1017, 1027

(8th Cir. 2003); *Okerlund v. United States*, 53 Fed. Cl. 341, 356 n. 23 (Fed. Cl. 2002); *In re Industrial*

*Commercial Electrical, Inc.*, 319 B.R. at 54-55.

With respect to the IRS's requests for payment of administrative period taxes, which is governed

by 11 U.S.C. § 503(a) and (b) (governing requests for payment of administrative expenses) instead of 11

U.S.C. § 502 (governing the allowance and disallowance of proofs of claim), the burden of proof differs

only in that the administrative claim does not enjoy prima facie validity conferred by § 502.  Therefore,

the burdens that would apply outside of bankruptcy, as set forth above, apply from the outset.

**Findings of Fact**

**a.      Purchase of Nantucket Property**

Peter and Jean Shaw are married to each other and the parents of three children, born in 1988,

1990, and 1995.  By 1995, Peter and Jean had developed a fondness for the island of Nantucket.  As

Peter testified, they thought of it as "a really great place for a family vacation."  While vacationing on

the island in 1995, they visited the 2400 square foot house at 22 Folger Avenue on the island (the

"Property" or "Nantucket House"), which was then owned by a colleague of Peter.  The Nantucket

House has three bedrooms and a loft, is a short walk from the beach, and enjoys views of the ocean and

of two ponds, one of which is on the Property itself.  For one week in each of the next seven summers,

from 1996 through 2002, they rented the Nantucket House for family vacations. They grew to love it and

thought of it as their special little spot

When it was placed on the market in 2001, they considered purchasing it as a vacation home.

Although the house was being offered at a lower price than the Shaw's ultimately bought it for (the

2001 offering price is not in evidence), they elected not to purchase, primarily because Peter did not

want the burden of the additional mortgage the purchase would have entailed.  Peter testified, "I felt

that for whatever use we ever wanted of a property in Nantucket it would be easy enough for us to

continue what we'd been doing and rent something."  They already owned a primary residence in

Wayland, Massachusetts, and, for vacations, a condominium unit in Warren, Vermont.

The next year, they heard that the Property had sold and that the purchaser, after only six to

nine months, was interested in "flipping the house," reselling at a profit, with the price having gone up

"not inconsiderably."  Jean wanted to take another look at the property.  Peter again had misgivings

about taking on the additional financial burden, but Jean argued that "we can actually make this work if

we . . . purchase the house and run it as a business."  Jean asked Peter, "if you'll give me the opportunity

to show you the numbers and I can convince you of the business -- validity of the business, would you be

amenable to the purchase?"  Peter agreed to hear her out.  Jean then developed a business plan that

involved renting the Property in both the summer and the off-season, which on Nantucket is everything

but July and August.  She asked the opinion of a financial advisor friend who told her the plan could

work.  On the basis of numbers she had worked up, Jean ultimately convinced Peter that the plan made

sense, "and based on that we went ahead and made the purchase."  They purchased the Property in

September 2002 for $850,000 and incurred a substantial loan, secured by a mortgage on the Property, to finance it.

Aside from what has been recounted above—that they intended to rent the property year round, both in summer and, at lower rates, in the off season, and that operation of the business would be wholly Jean's responsibility, not Peter's—no details of Jean's business plan, or of what she did to research and develop it, have been introduced into evidence. The Shaws have introduced no evidence of what they expected, when they purchased the property, by way of annual income, expenses, and net profitability from the business. Jean did apparently develop projections in her effort to convince Peter, but neither the projections nor their details were placed in evidence. Nor have the Shaws indicated what their objective was or what they expected success to look like. Did they expect to make a profit from the rentals? Or were they simply seeking to earn enough income to defray some or all of the expenses of owning the Nantucket House? The record contains no direct answer from the Shaws to these questions. Nor have they indicated whether and how the tax treatment of the Nantucket expenses figured into their business plan. They have not indicated that they intended for the Nantucket House business to replace some or all of the income that Peter was earning as the primary source of the family's income, and clearly they did *not* so intend.

The Shaws purchased the Property with the intention of using it to generate rental income, but they have not testified that this purpose was exclusive or primary. As Peter testified, their initial interest in the Property was for vacation use (when they themselves rented it from its previous owner), as was their initial interest in purchasing the Property. I find that the plan to use the Property to generate rental income was born of Jean's desire to make that objective—the objective of acquiring the Property as a vacation home—financially feasible or palatable. It is implausible that Jean (i) suddenly abandoned all desire to own the property for the family's vacation use and (ii) hatched an independent plan to go into business, *this* business, for the sole purpose of generating a profit. For these reasons, I conclude

that the Shaws' purpose in acquiring the Property, and later in holding it for all the years in issue, was

dual:  to own the Property for the family's vacation use, and to defray the cost of that ownership by

renting the Property to others.

Their vacation purpose was confirmed by the use the Shaws made of the Property during all the

years of their ownership.  Jean spent many days at the Nantucket House each year, including many in

the summer months, and her husband, children, and two dogs frequently were there with her.  Jean

maintains that, with the exception of three days in 2009, she worked on the rental business full time

every day she was there, weekends included.  Whether this is true or not, she concedes that her family

was frequently there with her and, while there, vacationing.[8]  She too speaks with affection of the

Nantucket House and clearly treasured her time there through the years in issue, whether she called it

vacation or something else.

The Shaws' vacation purpose is further confirmed by the rental business's performance from

2003 through 2010.  As will be set forth in more detail below, that record shows that, through no fault

of Jean's, the business never had the wherewithal to break even, much less to generate a profit.  This

was evident to them by the end of the 2004 rental season, when, for the second year straight, there was

no appreciable business to be had in the off-season.  They had counted on off-season rentals to make

the business work.  The inability of the business to generate income in excess of its own foreseeable

expenses—mortgage interest, real estate taxes, property insurance, utilities, maintenance costs,

broker's fees, etc.—must have been evident to both Jean and Peter from before the beginning of 2005.

In short, I find that the Shaws cannot have gone into this business venture with a good faith belief that it

would yield a profit.  They understood from the start that, at best, it would mitigate the cost of acquiring

and maintaining the Property.  As a stand-alone business venture, it would only lose money and

---

[8] There were limited exceptions, especially in early 2003, where Peter's time at the Nantucket House was spent
helping Jean with work on the business, but for the most part, Peter's and the children's time on the island was
personal or recreational.

therefore was not self-justifying.  For the Shaws, it was justified because it would enable them to own

the Nantucket House for their own personal use.

At times, such as in closing arguments, the Shaws have suggested that they purchased the

Property with a further business objective in mind:  to hold it as an investment, for its potential to

appreciate in value, and then sell it at a profit.  I find that they did not purchase or hold the Property for

this purpose.  At trial, Peter, whose testimony on this issue was inconsistent, nonetheless expressly

disavowed this purpose.  He explained that, before purchasing the Property, they satisfied themselves

that it was likely to appreciate in value but also that they did not purchase it as an investment

opportunity.  I find that even if they believed the Property might, in the long run, appreciate, they did

not purchase it to capture this appreciation.  They offered no evidence of any plan to resell in any

definite time frame.  Had they purchased it to capture appreciation, they would have attempted to sell it

no later than 2005, by which time, the evidence shows, they had suffered years of losses and the

Property had appreciated significantly in value.  Yet they did not attempt to sell until the end of the

rental season in 2007, after five years of losses.  Even then, they waited until after the rental season to

put it on the market, a move their broker advised against, and they did not price it low enough to sell—a

tepid effort.  They made no other attempt to sell, either before or after, notwithstanding consistent

operating losses.  Also, they discussed possibly using the Nantucket House as their retirement home.  I

conclude that they did not purchase the home for resale at a profit.  Rather, they purchased it to use as

a vacation home and also to rent for most of the year to defray the costs of ownership.

**b.    Performance of Nantucket Rental Business 2003-2010**

Upon acquiring the Property, the Shaws immediately made improvements to it—they added a

bathroom, expanded another, made landscaping and cosmetic improvements—and had it ready for

occupancy by the summer of 2003.  They offered the Nantucket House for rent to clients from 2003

through 2010.[9]

All rentals were during the prime summer season.  Jean was unsuccessful in obtaining off-

season rentals, on which she had been counting to narrow the gap between income and expenditures.

The market for off-season tenants was softer than she had anticipated; finding these renters required

connections she didn't have; and, except in the shoulder weeks (late June, early September), rates for

these rentals dropped off considerably.  By the start of 2005, the Shaws were well aware that the off-

season would not generate significant revenues for them, at least not enough to close the sizable gap

between income and expenses that they experienced in 2003 and 2004.  And this understanding was

only confirmed with each succeeding year.

Each year, the business operated at a substantial loss.  The business had the following weeks

rented, income from rents, total expenses, and net cash losses.

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|
| Weeks Rented | --[10] | 5 | 7 | 2 | 0 | 3 | 7 | 7 |
| Income (all from rents) | 16,490 | 14,008 | 25,900 | 9,600 | 0 | 12,771 | 20,993 | 21,500 |
| Mortgage Interest Paid | 37,989 | 32,771 | 32,950 | 39,707 | 36,549 | 57,781 | 19,967 | 4,992 |
| Total Cash Expenditures | 69,235 | 56,850 | 66,780 | 63,994 | 75,145 | 81,869 | 47,948 | 25,644 |
| Net Cash Loss | 52,745 | 42,842 | 40,880 | 54,394 | 75,145 | 69,098 | 26,955 | 4,144 |
| Noncash Loss  (mtg int not paid) | | | | | | | 37,000 | 52,000 |
| Total Losses | 52,745 | 42,842 | 40,880 | 54,394 | 75,145 | 69,098 | 63,955 | 56,144 |

With respect to years 2003 through 2008, the Shaws appear to have remained current on their

Property-related obligations; therefore, their cash losses for those years are their total losses.  In 2009

and 2010, however, the Shaws failed to make many of the mortgage interest payments that came due.

From a comparison of the Shaws' tax returns for 2009 and 2010 to their return for 2008, missed

---

[9] No evidence was submitted as to 2011, a year not in controversy.  The Shaws lost the Property to foreclosure in 2012.
[10] The number of weeks rented in 2003 appears not to be in evidence.

mortage interest payments appear to have totaled approximately $37,000 in 2009 and $52,000 in 2010.

Consequently, cash losses understate total losses for those years by $37,000 and $52,000 respectively.

By far the single largest expense item for the business was interest on the mortgage loan that

enabled the Shaws to purchase the Property.  In the first five years, through 2007, interest on that loan

averaged approximately $36,000 per year.  This amount, by itself, exceeds by $10,100 the most income

the Shaws made on the Nantucket rental in a single year.  In 2008, the annual interest burden increased

by approximately $20,000.  On the basis of (i) the consistent and sizable difference between income and

expenditures, (ii) the rental business's significant losses in 2003 and 2004, and (iii) the Shaws's

realization by 2005 that off-season business could not close the gap, I find that, at least as of the start of

2005, the Shaws understood and believed that the business could not be profitable.

Nor did their bankruptcy filing in 2009 alter their prospects of turning a profit or their beliefs

about the prospect of turning a profit.  When asked at trial why he and Jean had filed a petition under

chapter 11, Peter stated:

> Because we still felt that we had the opportunity to reorganize the
> business.  At the point we declared bankruptcy we had a very large
> mortgage on that property paying a very significant interest rate.
> Things had happened in the marketplace, particularly in the property
> marketplace subsequent to us getting that mortgage, and we felt with
> some respite that would allow us some reorganization and some ability
> to reorganize our debts that there was still a possibility for us to save
> our ownership of that property and establish the business.

Peter here testifies that he and Jean believed the bankruptcy filing offered them "a possibility for us to

save our ownership of that property and establish the business."  Nowhere did Peter or Jean testify that

either of them believed that the bankruptcy protection or a reorganization under chapter 11 would

render the Nantucket rental business *profitable*.  Neither Peter nor Jean nor any bankruptcy professional

offered testimony or other evidence as to how that might occur, or as to how the bankruptcy might

allow them to reorganize the business.  Even with the benefit of bankruptcy protection, which obviated

the need to pay interest on the mortgage during the chapter 11, the rental business still lost money in

13

both 2009 and 2010, and the Shaws finally let it go to foreclosure. I find that the prospect of bankruptcy relief made no difference in the Shaws' beliefs about the profitability of the business after the bankruptcy filing. I further find that the Shaws did not seek bankruptcy relief, or hire bankruptcy professionals in 2009 and 2010, in order to save the Nantucket rental business. They have submitted no credible evidence to that effect.

c.      **Vermont Rental 2009-2010**

In or around 2000, the Shaws acquired a condominium unit ("the Condo") in Warren, Vermont, near the Sugarbush ski resort. The purchase price was $85,000, which they paid without encumbering the Condo with a mortgage. They never mortgaged the Condo during their years of owning it. They used the Condo for family vacations in both summer and winter. In 2008, they decided to begin using the Condo for generation of rental income.

They began preparing the Condo for rental use in 2008 but, they maintain, began offering it for rent in 2009—precisely when in 2009, they do not indicate. They contend that they offered the Condo for rent in both 2009 and 2010. In 2009, they had no tenants or rental income at all. There is evidence that in September and October, 2009, the Shaws were considering placing the property on the market. Their own evidence for 2009 includes communications with brokers about placing the Condo on the market and about obtaining an appraisal for purposes of sale. Jean testified, with respect to the Nantucket House, that she would not put that property on the market while it was occupied by tenants: she believed it unfair to the tenants, and a detraction from the quality of her business, to have prospective purchasers intruding on them to view the Property during their tenancy. I therefore doubt that she would have been actively seeking tenants for the Condo at a time when she was considering marketing the Condo for sale. I therefore am not persuaded that the Shaws were in fact offering the Condo for rent during all of 2009.

They clearly did offer the Condo for rent in 2010.  Notwithstanding a number of inquiries from prospective tenants, the Condo had no rental use in 2010.  The only rental income they received from the Condo in 2010 was $7,200 as advance payment for a single tenant's occupancy over the first three months of 2011.  The Shaws offered no explanation for the lack of rental use in 2010 and no indication as to whether, and why, after 2009 they expected 2010 to be better.

In order to offer the property for rent, the Shaws incurred expenses totaling $10,718 in 2009 and $13,718 in 2010, for net losses of $10,718 in 2009 and $5,978 in 2010.  The weeks rented, income, expenses, and net losses for the condo are as follows:

|  |  | 2009 | 2010 |
|---|---|---|---|
| Weeks Rented |  | 0 | 0 |
| Income (all from rents) |  | 0 | 7,200 |
| Expenses: | Advertising | 330 | 0 |
|  | Appraisal[11] | 350 | 0 |
|  | Auto and Travel | 429 | 0 |
|  | Condo Fees | 4,722 | 6,300 |
|  | Furnishings | 0 | 492 |
|  | Repairs | 2,250 | 0 |
|  | Supplies | 45 | 480 |
|  | Taxes | 1,000 | 3,271 |
|  | Utilities | 1,592 | 2,635 |
| Total Expenses |  | 10,718 | 13,178 |
| Net Loss |  | 10,718 | 5,978 |

The Shaws did not rent the Condo in 2011 or 2012.

The record contains no testimony from the Shaws as to whether they expected that their rental of the Condo in 2009 and 2010 would yield income in excess of expenses.  They adduced no business plan or projections.  An undated notation in the "Notes" section of Jean's daily planner for 2009 suggests that they did not expect income to exceed expenses.  The notation reads:

---

[11] The Shaws list the appraisal expense as an expense of their rental business.  In fact, the appraisal appears to have been for purposes of sale, not rental, of the Condo.

*Vt—rent for $10,000.—*
*season*
*cover costs.*

Though cryptic and unexplained, this notation does appear to indicate that their objective was only to
"cover costs."  Total rent of $10,000 would not have fully covered their costs in either year.

The evidence preponderates in favor of a finding that the Shaws did not intend to rent the
condo in 2009 and 2010 at a profit.  I base this conclusion on several factors.  First is the above notation,
which suggests an intent only, at best, to cover expenses.  Second, in both years, the Condo operated at
a considerable loss, but the Shaws offered no testimony as to why they thought things might have
turned out differently—no indication that what happened differed from what they had expected would
happen.  The Shaws offered no business plan or evidence of their expectations as to the Condo's income
and expenses.  Third, the Shaws did not actually use the Condo for rental purposes in either year; they
had no renters at all.  This is not for lack of inquiry by prospective renters, as evidenced by numerous
email inquiries that the Shaws introduced into evidence.  Yet the Shaws offered no explanation for lack
of even a single rental in either year.

Jean testified that her family made no personal—that is, non-rental—use of the Condo after the
unspecified date in 2008 when they decided to commit the Condo exclusively to rental use.  There is
reason to question the credibility or accuracy of this testimony.  First, a notation in Jean's daily planner
for January 26, 2009, reads "tell B + S can use our condo Feb. 25th -7?"  The record contains no
explanation of this entry; it appears to be an indication that the Shaws were considering permitting
nonpaying guests to use the Condo for a few days.  Second, another notation in the same planner, on
August 7, 2009, says "Pam + Jeff to Vermont – to 16th."  Third, another notation in the same planner, on
October 5, 2009, says, "who to ask to Vermont?"  All three together suggest that, throughout 2009, the
Shaws were using or permitting others to use the Condo for non-rental purposes.

In addition, although Jean testified that she did not personally use the Condo in 2009, she also indicated that she spent 8 days at the Condo performing a total of only 32 hours of work.  In testimony that Jean offered concerning her work habits at Nantucket, she indicated that for her, a work day at the Nantucket House easily included 10 to 12 hours of work.  The math here leads to the conclusion that Jean herself spent a considerable portion of her time at the Condo in 2009 using the Condo for personal, nonbusiness purposes.  This is in addition to any use she may have allowed others to make of the Condo in 2009.

Jean also testified at deposition that family members accompanied her to the Condo in December 2010 while she was readying the property for the incoming tenant.  During that time, she worked and her family skied and vacationed.  She was physically present at the Condo for 7 days in 2010, working approximately 8 hours per day, for a total of 54 work hours.  A great deal of this time was spent removing her family's personal belongings from the premises, a process that entailed numerous trips to the dump.  In view of the size of this effort, I conclude that prior to the completion of this work, the Condo was not ready for occupancy.

### d.    Tax Returns and Audits

For each tax year from 2003 through 2010, the Shaws filed a joint federal income tax return.  For tax years 2003 to 2006, Jean prepared the return, Peter reviewed it, and both Jean and Peter signed it.  The Shaws concede that their returns for 2003 through 2006 each contained errors (separate and apart from the deductions that are the subject of this controversy) that resulted in underreporting of income and underpayment of taxes.  The IRS conducted an audit of the 2003 return in 2007, then later a combined audit of the 2004 through 2006 returns.  The Shaws eventually filed amended returns for 2004 through 2006, but only after the IRS had first notified them of reporting errors and conducted audits of those years.  The IRS issued notices of deficiency as to tax years 2004, 2005, and 2006.  The IRS audited the returns for 2007 through 2010 together in September 2011.

17

**i.      Tax Year 2003**

The Shaws filed their 2003 return on April 15, 2004.  On the 2003 return, they reported total

income from salary or wages of $218,547, a total tax of just $26, and entitlement to a refund of $49,493,

which the IRS promptly paid.  The 2003 return contained at least one admitted error, which the IRS

eventually brought to the Shaws' attention:  the Shaws had underreported Peter's earnings from

employment by approximately one-half.  The company by which he was employed in 2003 had changed

its corporate form at midyear, resulting in a slight change of name, so that, at year's end, he received

two W-2 forms from two similarly-named employers, in similar amounts but covering different halves of

the year.  The Shaws had reported income from only one of the two.  They contend the error was

innocent, a result of having failed to notice that there were two W-2 forms instead of one.

Notwithstanding their protestations of innocence, neither Jean nor Peter has indicated how they can

have failed to notice a 50% understatement of Peter's considerable salary in that year.  After the error

was brought to their attention, the Shaws conceded their error and eventually filed an amended return.

In 2006, an additional tax of some $26,082 was assessed on the income that had not been reported.

The tax and accrued interest remain largely unpaid to this date and are part of the IRS's claim for 2003.

Later, in January 2007, an IRS revenue officer audited the 2003 return and further determined

that the Shaws had inappropriately taken a deduction against non-rental income of some $99,619

(including depreciation of $53,347) in net loss from rental of the Nantucket property.   This

determination was based at least in part on the revenue officer's determination that Jean had not

performed more than 750 hours of services in real property trades or businesses in 2003 and therefore,

under 26 U.S.C. § 469, was not entitled to this deduction.  The Shaws contested this determination in

the United States Tax Court.  The Shaws and the IRS, through its appeals officer, settled the matter by an

agreement pursuant to which the Tax Court entered an agreed judgment on September 22, 2008 for a

further deficiency of $12,108.  The Shaws believed that this settlement reflected that the appeals officer

was satisfied that they had adequately shown that Jean had performed more than 750 hours of services in real property trades or businesses in 2003.

Jean also saw it as a vindication of the method she had employed to prove these hours of service to the IRS: a form of *post facto* reconstruction. She had assembled all the records of her rental business—invoices, emails, leases, travel and credit card records, etc.; and using these, in combination with knowledge of her work habits and her memory, she developed a proof of her time expended: part reconstruction, part estimate. Neither in 2003 nor in any year thereafter—even after she knew of the revenue agent's skepticism about her hours and her method of proving them—did Jean keep contemporaneous records of the time she expended in real property trades or businesses.

Jean offered no explanation for her failure to keep contemporaneous records. Especially after January 2007, when the IRS audited the 2003 return, she had to know that, if she did in fact work the requisite number of hours, it would be in her interest to keep contemporaneous records to prove the amount of time she expended in real property trades or businesses in each tax year. Unless she lacked confidence that her hours would exceed the statutory minimum, I can think of no reason she would not have kept such records. Certainly it was not for lack of diligence or attention on Jean's part: she was compulsive and meticulous about virtually every other aspect of the Nantucket rental business. In view of the value of this deduction to her and her husband, of which she was well aware, Jean would have maintained these records had she believed it in their interest to do so.

### ii.    Tax Year 2004

The Shaws underreported their income for 2004, but because of an unrelated adjustment, the IRS later determined that no tax is due for that year and accordingly amended its claim for 2004 to $0.

iii.    **Tax Years 2005 and 2006**

With respect to tax year 2005, the Shaws filed a return in April 2006 showing a net loss from

rental of the Nantucket property of $64,952, resulting in adjusted gross income of $183,768, a total tax

of $836, and entitlement to a refund of $12,876, which the IRS promptly paid.  With respect to tax year

2006, the Shaws filed a return in April 2007 showing a net loss from rental of the Nantucket property of

$77,559, resulting in adjusted gross income of $335,712 and a total tax of $0.  In February 2008, the IRS

notified the Shaws of its intent to conduct an audit of their 2005 and 2006 returns, specifying that the

audit would focus primarily on "all Schedule E expenses including depreciation" and "Passive Loss

Limitations."  On May 22, 2008, after the audit, the IRS issued a notice of deficiency as to both 2005 and

2006.  The notice indicated that the deficiency was comprised of additional taxes of $21,077 for 2005

and $65,420 for 2006 and of accuracy-based penalties under 26 U.S.C. § 6662(a) of $4,214.80 for 2005

and $13,084 for 2006.  The Shaws then filed amended returns for 2005 and 2006, after which, in 2010,

the IRS conducted a further audit, this time of the amended returns.

iv.    **Tax Years 2007-2010**

For tax years 2007 and 2008, the Shaws first filed returns on October 15, 2009, approximately

one month after their bankruptcy filing.  The return for 2007 showed a net loss from rental of the

Nantucket property of $98,718, resulting in adjusted gross income of $344,358, a total tax of $75,848,

and a balance due of $42,490.  The IRS assessed a penalty of $9,519.97 for late filing of the return and

another penalty of $3,596.43 for late payment of the tax.  The return for 2008 showed a net loss from

rental of the Nantucket property of $90,805, resulting in adjusted gross income of just $6,057 and a

total tax of $903.  The IRS assessed a penalty of $36.12 for late payment of the tax.

For tax years 2009 and 2010, the Shaws first filed returns on May 19, 2011.  The return for 2009

showed net losses from rental of the Nantucket and Vermont properties of $64,585, resulting in

adjusted gross income of $31,895, a total tax of $18,624, and a balance due of $15,824.  The return for

2010 showed net losses from rental of the Nantucket and Vermont properties of $34,905, resulting in

adjusted gross income of $116,578, a total tax of $29,109, and a balance due of $9,369.

The IRS conducted audits of the returns for 2007 through 2010 in August and September 2011.

These resulted in determinations of deficiency (*i.e.*, increases in the tax) of $56,545 in 2007, $39,006 in

2009, and $19,074 in 2010.  For 2008, the audit showed an overassessment (a decrease in the tax) of

$495.00.

e.     **Bankruptcy Filing and Professionals' Fees**

The Shaws maintain that they filed their bankruptcy petition at least in part to save their

Nantucket rental business, and therefore that certain attorneys' fees they incurred and paid in 2009 and

2010 in conjunction with the bankruptcy case should be treated for federal income tax purposes as

expenses of their rental business and not merely as personal expenses.  The expenses in question are

the attorney's fees of their bankruptcy counsel in 2009 and of their tax counsel in 2010.  I find virtually

no evidence to support the Shaws' position.  They offered no testimony, neither their own nor that of

any bankruptcy attorney, as to their strategy for saving the rental business and the Property from

foreclosure.  There is no indication that any third party was going to contribute money to pay off the

mortgage on the Property.  There is no evidence that rental income was likely to increase or expenses

decrease.  Dramatic changes would have been necessary.  The Shaws might have attempted, through a

chapter 11 plan, to rewrite the secured debt on the Property, but there was no evidence that the

savings from such a measure could have made the difference between success and foreclosure, or that a

plan of that nature could be confirmed.  In the end, the Property was lost to foreclosure in early 2012, a

result that seems from the present vantage point to have been inevitable; the Shaws have not shown

how it appeared any less inevitable when they first petitioned for bankruptcy relief.

As Peter testified, the bankruptcy filing was necessitated in part by the Shaws' tax debt.  They

contend that the tax debt, too, is a rental expense because it arises in part from denial of deductions for

net rental losses.  I find that the *amount* of the tax debt is indeed partly a function of the IRS's denial of

deductions for net rental losses, but this does not make the tax debt an expense of the rental business.

The income on which taxes are due is entirely income earned from sources other than the rental

business.  The denial of deductions for net rental losses does not make the tax debt an expense of the

rental business.  In fact, no tax is due on the rental business's own income, because the expenses of that

business exceed its income and result in a net loss.  The tax debt is in no part an expense of the rental

business.

**Discussion**

Of the eight years for which the IRS has asserted claims, three have been removed from

contention:  the IRS has withdrawn its claim for 2004, and the Shaws have withdrawn their objections to

the claims for 2003 and 2008.  The Court must therefore determine the deductability of rental expenses

for the Nantucket House in tax years 2005-2007, 2009, and 2010 and for the Vermont Condo in 2009

and 2010.

As a preliminary matter, I note that, of the various grounds on which the IRS now contends the

Shaws are not entitled to the deductions they claimed, only one was relied on in the IRS's audits:  the

passive activity loss rule in 28 U.S.C. § 469.  The Shaws have repeatedly pointed this out, as if it were a

matter of some consequence, albeit a consequence that they have never articulated.  Nonetheless, the

Shaws concede, and correctly so, that the IRS's previous reliance solely on the passive activity loss rule

does not foreclose the IRS from now arguing, in the alternative, that other grounds, too, might

constitute cause for disallowance of the same deductions.  The IRS's failure to cite these other grounds

earlier is of no consequence

a.      **Activity Engaged in for Profit, 26 U.S.C. § 183**

As a general rule, § 183 of the Internal Revenue Code effectively limits deductions for "activities

not engaged in for profit" to the amount of income derived from the activity.  26 U.S.C. § 183(a) and (b).

The IRS contends that, for each year in issue and for both properties, the Shaws' rental activity was not

an activity engaged in for profit within the meaning of § 183 and the regulations applying it.  The IRS

maintains that, in view of the huge costs of both the Nantucket and Vermont properties and the paltry

income they generated, it is not plausible that the Shaws held these properties to generate rental

profits.  The Shaws maintain that they purchased the Nantucket property and, in 2009 and 2010, owned

the Vermont Condo solely to rent these to the public for profit and therefore that their ownership of

these properties was a for-profit activity and, as such, not subject to § 183.

Section 183 states that "[i]n the case of an activity engaged in by an individual or an S

corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall

be allowed under this chapter except as provided in this section."  26 U.S.C. § 183(a).  Section 183

defines "activity not engaged in for profit" as "any activity other than one with respect to which

deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section

212."  26 U.S.C. § 183(c).  In general, § 162 allows the deduction of "all the ordinary and necessary

expenses paid or incurred during the taxable year in carrying on any trade or business[.]"  26 U.S.C. §

162.  In general, § 212 allows the deduction of all "ordinary and necessary expenses paid or incurred

during the taxable year for the production or collection of income [or] for the management,

conservation, or maintenance of property held for the production of income."  26 U.S.C. § 212.  "A

key requirement under both of these sections is that the taxpayer must have engaged in the

activity with the predominant purpose and intention of making a profit."  *Beltran v. Comm'r,*

23

T.C. Memo 1982-153, 1982 WL 11054 * (1982) and cases cited.  "The taxpayer's profit objective must be

bona fide, although it need not be reasonable, and greater weight is to be accorded the objective facts

rather than to the taxpayer's stated intent."  *Id*.

The regulations provide a list of factors to be considered.  See Treas. Reg. § 1.183-2 (2012).

"Although a reasonable expectation of profit is not required, the facts and circumstances must indicate

that the taxpayer entered into the activity, or continued the activity, with the objective of making a

profit."  Treas. Reg. § 1.183-2(a).  "[A]ll facts and circumstances with respect to the activity are to be

taken into account. No one factor is determinative in making this determination."  Treas. Reg. § 1.183-

2(b).  Among the enumerated factors are (i) whether the taxpayer carries on the activity in a businesslike

manner, (ii) whether the taxpayer devotes much of his time and effort to carrying on the activity, (iii) the

history of income or losses with respect to the activity, (iv) whether the taxpayer has substantial income

from sources other than the activity, and (v) the presence of personal pleasure, recreation, or other

personal motives in carrying on the activity.  *Id*.

I find that in each year in issue, the Shaws' rental of their Nantucket House was not carried on

for profit.  In so ruling, I am mindful that Jean conducted this activity in a business-like manner, that she

kept careful accounting records (except as to her time), and, whether or not she exceeded the 750-hour

threshold in any given year, devoted a great deal of time and effort to the venture in each year.  I am

more persuaded, however, by the overwhelming evidence that this venture could not be profitable and

that, at least from the start of 2005, the Shaws knew it could not be profitable. This is not an instance in

which the taxpayers irrationally believed their venture might turn a profit.  By 2005, the first year still in

issue, the Shaws had come to realize that there was virtually no off-season business to be had.  In view

of the size of their mortgage obligations and other expenses, and of the limitation of rentals to the

summer season, they had no hope of turning a profit.  They knew this and carried on the business

nonetheless, sustaining serious losses all the while, knowing they would.  They did this because they had

acquired the Property for their own use, had an emotional attachment to it, and, notwithstanding the

rental business, did use it for family purposes each year.  They didn't want to part with it.  Even Jean,

whose time on the island was mostly spent working, enjoyed simply being there, even while working.

They weren't relying on the Property as their primary source of income; Peter's earnings were their

primary support.  From 2005 through 2010, they rented the Property only to mitigate the cost of

ownership, not for profit.

With respect to the Vermont Condo, too, I conclude that the Shaws did not carry on their rental

activity for profit.  Two years are in issue.  With respect to 2009, the evidence preponderates in favor of

the conclusion that the Condo was not even offered for rent, much less at a profit.  And with respect to

both 2009 and 2010, the evidence suggests that the Shaws' hope, again, was at best to cover expenses,

not to make a profit.  The Shaws have not adduced credible evidence to the contrary, and in any event,

the evidence preponderates in favor of the IRS's position.

I have concluded that the Shaws' rental activity for both properties in each year in issue was not

engaged in for profit.  Having so concluded, the net expenses of that activity are not deductible,

regardless of how I might rule on disputed issues under §§ 469, 280A, and 195(a) and regardless of the

proper classification of the professionals' fees.  However, for the sake of completeness and finality, I will

nonetheless proceed to address § 469 and the other issues raised.

**b.       Passive Activity Losses, 28 U.S.C. § 469**

Section 469 of the Internal Revenue Code disallows the deduction of net losses from "passive

activities."  26 U.S.C. § 469(a).  It defines passive activity to include any rental activity except as provided

in paragraph (7) [§ 469(c)(7)]."  26 U.S.C. § 469(c)(2).   Paragraph (7) states that "if this paragraph applies

to any taxpayer for a taxable year," then two consequences follow.  First, "paragraph (2) shall not apply

to any rental real estate activity of such taxpayer for such taxable year[.]"  26 U.S.C. § 469(c)(7)(A)(i).

That is, the determination of whether a rental activity is a passive activity shall be made without

paragraph (2)'s categorical exclusion of rental activities. And second, "this section shall be applied as if each interest of the taxpayer in rental real estate were a separate activity," provided however that "a taxpayer may elect to treat all interests in rental real estate as one activity." 26 U.S.C. § 469(c)(7)(A)(ii). To determine whether paragraph (7) applies to a taxpayer for a taxable year, two requirements must be satisfied:

> This paragraph [paragraph (7)] shall apply to a taxpayer for a taxable year if--
>
> (i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and
>
> (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.
>
> In the case of a joint return, the requirements of the preceding sentence are satisfied if and only if either spouse separately satisfies such requirements.

26 U.S.C. § 469(c)(7)(B). "For purposes of this paragraph [§ 469(c)(7)], the term 'real property trade or business' means any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business." 26 U.S.C. § 469(c)(7)(C). The Shaws acknowledge the applicability of these requirements but contend that Jean has satisfied both for each year in issue. The IRS contends that Jean has not satisfied either requirement for any year and does not concede even that she "materially participated" in real property trades or businesses in the years in question. Accordingly, the court must decide, for each tax year in issue, (1) whether Jean materially participated in the real property trades or businesses on which she relies for satisfaction of § 469(c)(7)(B)(i) and (ii), (2) whether more than one-half of the personal services performed in trades or businesses by Jean during such taxable year were performed in real property trades or businesses in which Jean materially participated, and (3) whether Jean performed at least 750 hours of service in real property trades in which she materially participated.

26

### i.    Material Participation

"Material participation" is a defined term.  "A taxpayer shall be treated as materially

participating in an activity only if the taxpayer is involved in the operations of the activity on a basis

which is (A) regular, (B) continuous, and (C) substantial."  26 U.S.C. § 469(h)(1).  Also, "[i]n determining

whether a taxpayer materially participates, the participation of the spouse of the taxpayer shall be taken

into account."  The Shaws rely only on participation by Jean and do not contend that Peter had any role

in establishing their satisfaction of § 469(c)(7)(B)(i) and (ii).  I therefore must determine, for each year in

issue, whether Jeans' involvement in each of the real property trades or businesses on which the Shaws

rely to establish their satisfaction of § 469(c)(7)(B)(i) and (ii) was "regular, continuous, and substantial."

In order to meet the 750-hour requirement, they rely primarily but not exclusively on the

Nantucket rental business.  In each year, the Nantucket rental business occupied by far the largest share

of the time Jean expended on real property trades and businesses, but for tax years 2005 through 2007,

the Shaws also rely on other activities in which Jean claims to have participated to a much lesser extent.

For 2005, she claims to have materially participated, for 48 of 830 total hours, in a "special project"

researching the acquisition of additional rental or investment properties in Vermont.  For 2006, she

claims to have materially participated, for 180 of 816 total hours, in the research and development of a

plan to acquire and develop a property in Wayland, Massachusetts.  For 2007, she claims to have

materially participated, for 80 of 857 total hours, in another "special project" concerning the effect of a

Wayland development project on traffic around their residence.  In 2009 and 2010, Jean claims to have

materially participated in real property businesses for 864.5 hours and 961 hours respectively, of which

89 and 68 were attributable to rental of the Vermont property.  For these latter two years, however, the

Shaws elected pursuant to § 469(c)(7)(A) to treat all interests in rental real estate as one activity, and

therefore the Shaws need not show separate material participation in the Vermont rental business for

2009 and 2010.  It is enough to show material participation in the one combined rental business.

On the basis of both Jean's and Peter's testimony and of the records they adduced, I find that Jean's participation in the Nantucket rental business in 2005 through 2007, and in the combined Nantucket and Vermont rental business in 2009 and 2010, was, in each year, regular, continuous, and substantial.  While the IRS does not concede this point, neither does the IRS actively dispute it.  The evidence of Jean's material participation in the Nantucket rental businesses for each year is overwhelming, credible, and uncontroverted.  I conclude that she did materially participate in these businesses in each year in issue.

Regarding 2005, I conclude that the Shaws have not carried their burden of showing Jean's participation that year in researching the acquisition of additional rental or investment property in Vermont was material participation.  Her testimony on this issue is thin.  She indicated nothing more than that she and her husband stayed in the Condo and looked at properties.  While I find that the Shaws did indeed spend some time looking at properties in Vermont, the scant testimony and other evidence[12] does not address the regularity, continuity, and substantiality of the effort.  As the IRS contends, it is hard to believe that as Nantucket was continuously losing money and they had not yet decided to rent the Condo, they were seriously considering another rental acquisition.  The evidence is at least as consistent with the conclusion that they looked at properties as a way to pass some vacation time and considered making an offer on one.  Material participation as to this project has not been shown.

Regarding 2006, I find that the Shaws have carried their burden of showing that Jean materially participated in the research and development of a plan to acquire and develop a property in Wayland, Massachusetts.  Her testimony as to this project shows that she researched and developed a plan to

---

[12] The other evidence consists of pages 161 through 192 of their 2005 Activity Log.  These pages consist of listing sheets generated in the fall of 2005, an email from a Vermont real estate broker that sets up an appointment for the Shaws to see one property on September 3, 2005, and an email from Peter to Jean, a few days later, discussing the pros and cons of making an offer on one property, partly for investment and partly for "someday . . . living there."

acquire, by a mutually advantageous exchange of property with a neighbor, real estate abutting or near

their residence that they would then develop and sell at a profit.  Though nothing came of it in the end,

she has established that over a two month period, her work on this project was regular, continuous, and

substantial.

Regarding 2007, I find that Jean has not established that she materially participated in the  so-

called "special project" concerning the effect of a Wayland town-center development project on traffic

around the Shaws' residence.  The IRS takes the position that Jean's consideration of the impact of this

development on her primary residence does not constitute the performance of service in a real property

trade or business.  I need not address that issue because, whether Jean's efforts in this regard somehow

constitute business, she has not demonstrated that these efforts, which she quantifies without support,

detail, or corroboration at 80 hours, were regular, continuous, and substantial.  The substance and

nature of her efforts are simply not in evidence.

### ii.       More Than One-Half

The next issue is whether, as required by § 469(c)(7)(B)(ii), more than one-half of the personal

services that Jean performed in trades or businesses during each year in issue were performed in real

property trades or businesses in which Jean materially participated.  The IRS does not concede this issue

but also does not actively contest it.  The evidence is clear and uncontroverted that Jean performed no

personal services in any other trade or business than the real property trades and businesses on which

she relies to establish her 750 hours for each year.  For each year she performed numerous hours on the

Nantucket rental business.  She therefore easily satisfies the one-half requirement.

### iii.      More than 750 Hours

The last factual issue under § 469 is whether, in each year in issue, Jean performed more than

750 hours of services in real property trades or businesses in which she materially participated, as

required by 26 U.S.C. § 469(c)(7)(B)(ii).  The IRS takes the position that she did not perform more than

750 hours of service in any year and that the method she has employed to prove her hours—a form of

estimate and reconstruction involving no contemporaneous time records—is, as a matter of law not

reasonable.  The Shaws maintain that their method is reasonable and expressly sanctioned by applicable

regulations, and that they have carried their burden as to each year in issue.

The Court agrees with the Shaws that the method they have employed to establish the hourly

extent of Jean's participation is not impermissible.  The Treasury Regulations promulgated under § 469

address this issue directly:

> (4) Methods of proof.  The extent of an individual's participation in an
> activity may be established by any reasonable means.
> Contemporaneous daily time reports, logs, or similar documents are not
> required if the extent of such participation may be established by other
> reasonable means.  Reasonable means for purposes of this paragraph
> may include but are not limited to the identification of services
> performed over a period of time and the approximate number of hours
> spent performing such services during such period, based on
> appointment books, calendars, or narrative summaries.

Treas. Reg. § 1.469-5T(f)(4).  By authority of this regulation, contemporaneous time records are not

required if the extent of participation can be established by other reasonable means.  *Id*.  And "other

reasonable means" are expressly defined to include precisely the method the Shaws have employed:

"the identification of services performed over a period of time and the approximate number of hours

spent performing such services during such period, based on appointment books, calendars, or narrative

summaries."  *Id*.  The IRS contends that the Shaws' method is more akin to the "ballpark guesstimate"

method that the tax courts have rejected.  I do not dispute that the Shaws' method involves a critical

measure of estimation and reconstruction, but I cannot distinguish it from the method expressly

sanctioned by the Treasury Regulation and therefore do not rule their method impermissible.

Still, permissible and persuasive are two different things, and much depends on the execution

and credibility of the effort.  Here I have several reasons in general to dispute the credibility and

reliability of the Shaws' reconstruction for each year.  First, for each year, the Shaws performed this

effort twice—once for the IRS's audit of that year, and once again for trial—with results that in places

diverged significantly.

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Deposition** | 844 | 831 | 812 | 887 | 905 | 918.5 | 888.5 |
| **Trial** | 902 | 830 | 816 | 857 | 755 | 864.5 | 961 |
| **Differences** | 58 | 1 | 4 | 30 | 150 | 54 | 72.5 |

The differences of 1, 4, and 30 hours are of little concern and would even be reassuring if the differences

were consistently in that range.  The differences of 58, 54, and 72.5 are more troubling, as errors of that

magnitude could convert the totals for 2005 and 2006 into numbers below 750.  The difference of 150

hours in 2008 is of particular concern; in all but one of the years in issue, an error of that magnitude

could alter the disposition.   None of the differences was explained at trial.

Second, the court is mindful that, as the Shaws conceded, they underreported their income in

each tax year from 2003 through 2006, including in 2003 by omitting fully half of Peter's salary.  This is

an error of gross proportion.  Even if innocent, these errors call into question the Shaws' accounting

skills.

Third, motivation is an issue here.  The deductibility of their rental expenses against non-rental

income is an issue of considerable monetary consequence, one on which the Shaws are highly motivated

to reach a particular conclusion, to demonstrate that Jean expended over 750 hours in each year.  They

fashioned their activity log for each year with that goal in mind.  The effort is hardly scientifically neutral.

Fourth, I can think of no good reason for Jean's failure, after January 2007—by which time she

undisputedly was aware of the need and import of proving 750 hours of service each year—to keep

contemporaneous records of her time.  This is all the more remarkable where the Shaws claim that a

considerable amount of time for each year was time spent by Jean working on Nantucket, and where

her own "accounting," such as it is, shows her daily work hours to be variable:  in some periods

averaging over ten hours each day, in some much less.  How can she now know, years after the fact,

how many hours she worked in each stay on the island, without benefit of contemporaneous time

records?  The lack of these records suggests that she herself believed she might benefit from a less

transparent method of proof.

For these reasons, I am inclined to view the reconstructed record as padded and not entirely

reliable.  Having said these things, it is also clear that Jean did work a great deal of time each year on the

Nantucket rental business.  Moreover, by virtue of her business model—a high-end rental for those who

like things to be just so—and her proclivity toward perfectionism, she invested more time in this venture

than might otherwise seem warranted.  (My task is simply to determine whether she worked the hours

she claimed, not to determine whether they were necessary.)  Still, she must prove not just a great deal

of time but, as § 469(c)(7)(B)(ii) requires, "more than 750 hours."  With that, I turn to the individual

years in question.

For 2005, the Shaws claim a total of 830 hours.  This sum includes 48 hours on a "special

project" in which I have determined that they have not proven that Jean materially participated.  This

leaves 782 claimed hours and a margin of error of only 32 hours.  In view of this thin margin and the

weaknesses in their method of proof discussed above, I am not persuaded by a preponderance of the

evidence that they have established 750 hours of service in 2005.

For 2006, the Shaws claim a total of 816 hours.  This includes 180 claimed hours in the research

and development of a plan to acquire and develop a property in Wayland, Massachusetts.  While I have

found that Jean did materially participate in this project, I do not find that the Shaws have established

180 hours of service on that project.  The evidence is devoid of any records or other methods by which

Jean's time on this project can reliably be determined.  In view of the importance of these 180 hours to

establishing the requisite 750 hours, the almost complete lack of proof as to these hours, and the

weaknesses in their method of proof discussed above, the evidence does not preponderate in favor of a finding of 750 hours of service in 2006.

For 2007, a year in which they had no rentals at all, the Shaws claim a total of 857 hours, including 80 on another "special project"—concerning the effect of a Wayland development project on traffic around their residence—on which I have determined that they have not proven that Jean materially participated. This leaves only 777 hours. During this year, Jean claims to have spent a record high 79 days on the island—including 66 days between June 27 and September 10—and to have worked substantially all of every day, for a record high total of 447 hours' work on the island—all this for no rentals at all. This simply is not credible, and I have no confidence that the actual number of hours worked exceeds 750. The evidence preponderates in favor of the conclusion that it does not.

For 2009, the Shaws claim a total of 864.5 hours, including at least 89 hours devoted to the Vermont rental. In 2009, they rented the Nantucket House for 7 weeks, and Jean claims to have spent only 23 days and 253 work hours at the Nantucket House. The numbers regarding Nantucket are therefore more credible and realistic than for 2007. With respect to Vermont, however, I find little evidence to suggest that she devoted time to the rental of the Condo. The evidence suggests that in 2009 their concern was only with marketing the Condo for sale, and therefore I find no credible evidence of any hours worked on rental of the Condo. Sale of the Condo is not a real property business in which she claims or has proven that she materially participated, and therefore time spent on sale of the Condo may not be counted toward the 750-hour requirement in 26 U.S.C. § 469(c)(7)(B)(ii) (requiring more than 750 hours "in real property trades or businesses *in which the taxpayer materially participates*" (emphasis added)). Without the 89 hours attributed to Vermont, the Shaws' claimed hours for 2009 are reduced to 775.5, leaving a margin of error that, in view of the general problems outlined above, I find is insufficient to permit me to find by a preponderance of the evidence that Jean's actual work exceeded 750 hours.

For 2010, the Shaws claim a total of 961 hours worked, including at least 68 devoted to rental of

the Vermont Condo.   In 2010, the Shaws rented the Nantucket House for 7 weeks, offered the Vermont

Condo for rent, and entered into a three-month lease of the Condo.   For the generally applicable

reasons cited above, I view the claim of 961 hours as inflated and not wholly reliable, but, after

consideration of the various issues raised by the IRS in its proposed findings and conclusions, the margin

of error here leaves me satisfied by a preponderance of the evidence that Jean worked more than 750

hours in 2010 on real property businesses in which she materially participated.   In summary, I conclude

that the requirement of more than 750 hours has been satisfied for tax year 2010 but not for any other

tax year in issue.

**c.      Limitation for Personal Use, 28 U.S.C. § 280A(c)(5)**

The IRS takes the position that, if the Shaws' deduction of net losses from rental of the

Nantucket House and Vermont Condo is not disallowed on other grounds, then, in the alternative, it is

subject to disallowance in full, or if not in full then in part, for each year in issue by operation of 26

U.S.C. § 280A(c)(5), because, in each year, the Shaws used these properties for "personal use" and as "a

residence" within the meaning of § 280A(d)(1) and (d)(2).   The Shaws contend that except for three

days' personal use of the Nantucket House in 2009, they made no personal use of either property in any

year in issue.   They contend that on each day that any member of their family used either dwelling, Jean

was engaged there in repair and maintenance of the dwelling on a substantially full-time basis; and,

citing Prop. Treas. Reg. § 1.280A-1(e)(6), 48 F.R. 33320 (July 21, 1983), they argue that no day on which

the taxpayer engages in repair and maintenance of the unit on a substantially full-time basis may be

considered a day of personal use by the taxpayer.

For present purposes, I need not explicate the daunting architecture of 26 U.S.C. § 280A.   The

parties do not dispute its material provisions.   First, the taxpayer's use of a dwelling unit either "for

personal purposes" or as "a residence," as these are defined in § 280A, results in limitation, in whole or

in part, of deductions that might otherwise be allowed for rental of the dwelling unit.  The precise

nature and extent of these limitations is not before me to decide; it suffices to note that, if the

Nantucket House or the Condo was used either for personal purposes for any day in issue or as a

residence for any year in issue, that fact would affect the deductibility of the Shaws' net losses.  Second,

the statute defines "use for personal purposes" as follows:

> For purposes of this section, the taxpayer shall be deemed to have used
> a dwelling unit for personal purposes for a day if, for any part of such
> day, the unit is used--
>
> > (A) for personal purposes by the taxpayer or any other person
> > who has an interest in such unit, or by any member of the
> > family (as defined in section 267(c)(4)) of the taxpayer or such
> > other person;
> >
> > (B) by any individual who uses the unit under an arrangement
> > which enables the taxpayer to use some other dwelling unit
> > (whether or not a rental is charged for the use of such other
> > unit); or
> >
> > (C) by any individual (other than an employee with respect to
> > whose use section 119 applies), unless for such day the dwelling
> > unit is rented for a rental which, under the facts and
> > circumstances, is fair rental.
>
> The Secretary shall prescribe regulations with respect to the
> circumstances under which use of the unit for repairs and annual
> maintenance will not constitute personal use under this paragraph,
> except that if the taxpayer is engaged in repair and maintenance on a
> substantially full time basis for any day, such authority shall not allow
> the Secretary to treat a dwelling unit as being used for personal use by
> the taxpayer on such day merely because other individuals who are on
> the premises on such day are not so engaged.

26 U.S.C. § 280A(d)(2).  Third, where a dwelling unit is used "for personal purposes for a number of days

which exceeds the greater of—(A) 14 days, or (B) 10 percent of the number of days during such year for

which such unit is rented at a fair rental," the taxpayer is deemed to have used the unit in that year as a

"residence."  26 U.S.C. § 280A(d)(1).  On the basis of these provisions, the Court must decide, for each

year in issue and each dwelling unit, how many days, if any, the Shaws used the dwelling unit for

personal purposes.

      i.     **Nantucket House**

The Shaws concede that Jean, either alone or with other family members, made use of the

Nantucket House each year for a specified number of days, and Jean contends that during each such

day, she worked on repair and maintenance of the house substantially full time, for a specified total

number of hours.  Jean did not keep a contemporaneous record of the hours she worked at the

Nantucket House.  The Shaws made no attempt to account for or establish Jean's work hours on a day-

by-day basis.  Through their travel records, however, they were able to specify the days she spent at the

Nantucket House.   The following table sets forth the total number of days she spent at the Nantucket

House, the specific days she was there, the alleged total hours of work for each year, the average hours

worked per day, and the number of weeks the house was rented in each year.

| Year | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Days of Use | 35 | 37 | 75 | 79 | 58 | 23[13] | 44 |
| Specific Days | 5/6-5/9 5/28-5/30 6/13-6/14 6/15-6/16 6/24-6/26 6/30-7/9 7/18-7/28 8/14 8/21 9/18-9/20 11/26-11/29 12/3-12/5 | 4/20-4/24 5/21-5/23 5/28-5/30 6/16-6/24 6/26-6/30 8/14-8/22 11/25-11/27 | 4/21-4/23 6/16-8/13[14] 8/28-9/10[15] 12/1-12/3 | 3/19 4/6-4/8 4/26-4/29 6/6-6/8 6/27-8/2 8/6-8/24 8/27-9/10 9/20 12/5 | 3/1-3/2 4/21-4/25 6/16-6/27 7/10-8/4 8/24-9/4 12/4-12/7 | 4/22-4/25 6/10-6/14 7/18-8/1 10/29-10/31 | 6/15-6/20 6/25-7/11 7/18-8/2 8/29 9/7 12/2-12/5 |
| Hours Worked | 314 | 312 | 328 | 447 | 370 | 253 | 342 |
| Avg. hours/day | 8.97 | 8.43 | 4.37 | 5.66 | 6.38 | 11 | 7.77 |
| Weeks Rented | 5 | 7 | 2 | 0 | 3 | 7 | 7 |

---

[13] This number does not include the 3 days of admitted personal use of the Nantucket House in 2009.

[14] This 58-day spell includes unspecified days that Jean spent off-island and another spell of almost two weeks that she spent on Nantucket but at another rental property.  This spell involved only 40 days at the Nantucket House.

[15] Jean counts this 14-day spell as only 8 work days, notwithstanding her testimony that she worked substantially full time every day she was at the Nantucket House that year.  The Shaws have offered no explanation for this discrepancy.  I count it as 14 days at the Nantucket House.

The burden in the first instance is on the Shaws to adduce credible evidence, as to each day of use, that Jean used the house on that day for a purpose other than personal use.  I find Jean's testimony that she worked substantially full time every day to be more credible with respect to some days than others.  It is credible with respect to those relatively short trips she made to open the house in the spring, to close it in the fall or winter, to clean it between tenants, and to deal with incidents of arson and property damage.  In these instances, there were clear tasks needing to be done, her time on the island was of short duration, the season and temperature were not optimal for vacation, and Jean generally was not accompanied by family.  It is also more credible for 2003 and 2004 than it was for later years because Jean herself testified that by the end of 2004, she had completed the process of renovating the Property into the form and readiness she wanted for her rental business.  After 2004, maintenance would still be required, but not major improvements, and the time required should have decreased.  With the exception of 2009, however, hourly totals after 2004 were higher than in 2004; this is all the more remarkable because in 2006, 2007, and 2008, total rental usage dropped off considerably.

I find Jean's testimony especially *in*credible with respect to the longer spells of summer usage in each of the years in question:  three weeks in 2005; most of the summer of 2006, a year with only two rental weeks; two months in 2007, a year with no rentals at all; two weeks in 2009; and four weeks in 2010.  I do not doubt that Jean worked some hours during these spells, but she has not credibly established that she worked substantially full time every day.  During these spells, she was often there with her family and two dogs.  A substantial portion of the work she would have been doing during this period would have consisted of cleaning up after the family and dogs and restoring the property to rental-ready condition.  She was meticulous and obsessed over the smallest blemishes, of which the dogs—if not also the people—by her own admission provided plenty.  This kind of maintenance is personal use, not business.  I am mindful as well that the Shaws' first interest in this house was for

vacation use, and the evidence shows that they used it for that purpose.  I do not believe that Jean

wholly excluded herself from the family's vacationing.

My findings are affected as well by evidence that for Jean, the line between work and vacation is

not clear.  During her birthday week in the summer of 2005, a week during which the Nantucket House

was being rented, she elected to celebrate her birthday by vacationing with her family at another house

on Nantucket.  More to the point, she explained that during that vacation week, she worked on the

Nantucket rental business full time; she did not view this work as a diversion from vacation but as simply

how she liked to spend her vacation.  The upshot of this is that in Jean's mind, a week of vacation is

indistinguishable from a week of work.  Shopping, looking at other rental homes, conversations with

neighbors about local real estate, projects and interests in internal decoration, all get labeled as work

regardless of how closely related to the needs of the rental business.  I must largely rely on Jean's

credibility and judgment to determine that, during these weeks, the activities she called work were in

fact work and not just vacation pastimes by another name.  I lack confidence in her credibility and

judgment on these issues.

For this reason among the others mentioned above regarding her work hours in general and her

work hours on the island in particular, and lacking a more precise method, I find it fair to discount Jean's

claimed days of substantially full-time work during these summer weeks by half.  In other words, I find

that Jean has credibly established that she worked substantially full time on half the days in these

summer periods but not more; as to the balance, the evidence preponderates in favor of a finding of

personal use.  Accordingly, I find that Jean, either alone or with other family members, used the

Nantucket House for personal purposes for 10 days in 2005, 22 days in 2006, 35 days in 2007, 10 days in

2009,[16] and 16 days in 2010.  My findings as to days of personal use and days of fair market rental (the

latter being undisputed) for the Nantucket House are as follows:

---

[16] This number includes the 3 days of admitted personal use.

|  | 2005 | 2006 | 2007 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Days of personal use** | 10 | 22 | 35 | 10 | 16 |
| **Days of Fair Market Rental** | 49 | 14 | 0 | 49 | 49 |

    ii.       **Vermont Condo**

The Shaws concede that Jean, either alone or with other family members, made use of their Vermont Condo for 8 days in 2009 and 7 days in 2010, and Jean contends that during each such day, she worked on repair and maintenance of the Condo substantially full time, for total hours worked of 32 in 2009 and 54 in 2010.  Jean did not keep a contemporaneous record of the hours she worked at the Condo.  The Shaws made no attempt to account for or establish Jean's work hours on a day-by-day basis.

The Shaws have not carried their initial burden of adducing credible evidence that Jean worked substantially full time during the 8 days she spent at the Condo in 2009.  She herself claims to have worked only 32 hours in 8 days, an average of 4 hours per day, which is not substantially full time, more like half time.  In addition, the Shaws have adduced no credible evidence that, in 2009, they were preparing the Condo for rental at all.  Rather, there is evidence that they were preparing the Condo for sale and allowing friends to use the Condo gratis.   I conclude that all 8 days of the Shaws' use of the Condo in 2009 was personal use.

With respect to 2010, the Shaws contend that Jean worked 54 hours over 7 days.  They adduced contemporaneously-entered calendar notations to show that these 7 days occurred in two periods in December 2010.  This work occurred after the lease for early 2011 had been entered into, as time was drawing short to prepare the Condo for its first tenant.  I have no evidence of other use of the Condo in 2010.  I find that the Shaws have adduced credible evidence that their only use of the Condo in 2010 was on days on which Jean worked substantially full time on the rental of that property.  They made no personal use of the Condo in 2010.

**d.      Deductibility of Professionals' Fees**

In their 2009 and 2010 returns, the Shaws deducted, as expenses of their rental business, the legal expenses they incurred in those years in conjunction with their bankruptcy filing.  The IRS disallowed the deduction as a rental expense but allowed it as a personal expense.  As a personal expense, it is subject to a cap that effectively denies to the Shaws some or all benefit of the deduction. The Shaws object to this reclassification.  The court must therefore determine whether the professionals' bankruptcy-related fees were incurred in furtherance of the Shaws' rental business.  The initial burden is on the Shaws.

They have not satisfied that burden.  The fees in question are those of their bankruptcy counsel in 2009 and of their tax counsel in 2010.  The Shaws offered very little evidence on this issue at all, only the testimony of Peter to the effect that when they filed their bankruptcy petition, he and Jean believed they might thereby be able to save the business.  They have offered no evidence to corroborate this testimony.  All evidence suggests that, absent a very large cash infusion—one large enough to pay off most or all of the mortgagee's secured claim—the Nantucket rental business would remain a significant money loser, not a basis for a confirmable plan of reorganization.  Though I doubt that Peter and Jean knew the intricacies of bankruptcy reorganization law, they were keenly aware that the Property had long been operating significantly in the red, and they introduced no evidence as to why they may have had more hope for it when they filed a petition under chapter 11.  I conclude that the bankruptcy filing itself was not an effort to salvage the Nantucket rental business.

Some of the fees were paid to tax counsel, whose role in this case was to assist the Shaws in fashioning the present objection to claim and in otherwise dealing with the Shaws' federal tax debt.  The Shaws have not shown how that assistance was an expense of their rental business.  The taxes in question arise entirely from income other than the rental businesses.  (For each year, the rental income was offset entirely by allowed deductions of rental expenses; only *net* losses were disallowed.)  As a

matter of law, the subject matter of the Shaws' objection to the IRS's claim—denial of deductions for net rental losses—does not make the tax problem an expense of the rental business.  Rather, it is a personal problem that the rental business has not mitigated.

For these reasons I conclude that, in addition to the other reasons for which net rental expenses are disallowed for 2009 and 2010, these particular expenses are not rental expenses, and therefore they may not be deducted as expenses of the rental business.

### e.    Vermont Start-Up Expenditures

Section 195(a) of the Internal Revenue Code states that "[e]xcept as otherwise provided in this section, no deduction shall be allowed for start-up expenditures."  The IRS contends that the Shaws' expenditures in 2009 and 2010 to prepare the Vermont condominium for rental use in 2011 are start-up expenditures and, on that basis, must be disallowed.   However, the IRS raised this issue for the first time only after the evidentiary hearing.  The Shaws were afforded no notice of this issue and did not actually litigate it.  I therefore overrule this challenge as a potential basis for disallowing deductions for the Vermont expenditures.

### f.    Accuracy-Related Penalties

In their proposed findings and conclusions, the Shaws challenged the portion of the IRS's claim for each year in issue that constitutes an accuracy-related penalty (including the interest thereon). However, the Shaws raised this particular basis for objection to the IRS's claims only after the close of the evidentiary hearing.  The IRS was afforded no notice of the issue, and the issue was not actually litigated.  I therefore overrule as untimely his particular basis of objection.

### g.    Valuation of Secured Claim

The Shaws have also asked the Court to determine under 11 U.S.C. § 506(a) that no portion of the IRS's claim is secured, because the value of the IRS's interest in the estate's interest in the property

that secures the secured portion of Claim 4-4 is $0.  This request is not properly part of an objection to

claim; § 506(a) merely specifies the extent to which an *allowed* claim is a secured claim.  Also, unless

and until a plan of reorganization is filed, the determination that this request seeks would serve no

evident purpose.  In any event, the Shaws conceded that they had not answered discovery requests that

the IRS had propounded on this issue.  Accordingly, the Court will deny this request without prejudice to

adjudication when and if the same is necessary and the IRS has been afforded the benefit of the

discovery to which it is entitled.


**Conclusion**

For the reasons set forth above, the Court will by separate order overrule the Shaws' objection

to claim as to tax years 2003, 2005, 2006, 2007, and 2008, allow the IRS's Motion for Payment of

Administrative Taxes as to 2009 and 2010, and deny without prejudice the Shaws' request under 11

U.S.C. § 506(a) for valuation of the secured portion of IRS's allowed claim.


Date:  February 20, 2013                     _____

                                             Frank J. Bailey
                                             United States Bankruptcy Judge

**APPENDIX**

| Year | Property | Weeks Rented | Rental Income | Claimed Expense Deduction[17] | Net Loss | Total Hours Claimed: Deposition /Trial | Travel Hours | Hours Worked: on island/at condo | Days on Island/at Condo | Tax Claim[18] | Claim Itemized: tax, interest, penalty | Year in Dispute? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003 | Nantucket | | $16,490 | $69,235 | $52,745 | NA/815 | | | | $42,320.00 | $22,808.00 10,605.46 8,906.54 | No |
| 2004 | Nantucket | 5 | $14,008 | $56,850 | $42,842 | 844/902 | 104 | 314 | 35 | $0.00 | $0.00 0.00 0.00 | No |
| 2005 | Nantucket | 7 | $25,900 | $66,780 | $40,880 | 831/830 | 70 | 312 | 32 | $26,240.21 | $17,352.00 4,379.33 4,508.88 | Yes |
| 2006 | Nantucket | 2 | $9,600 | $63,994 | $54,394 | 812/816 | 38 | 328 | 75 | $23,591.05 | $16,726.00 2,651.30 4,213.75 | Yes |
| 2007 | Nantucket | 0 | $0 | $75,145 | $75,145 | 887/857 | 82 | 447 | 79 | $106,055.28 | $98,856.00 7,199.28 0.00 | Yes |
| 2008 | Nantucket | 3 | $12,771 | $81,869 | $69,098 | 905/755 | 62 | 370 | 58 | $993.99 | $978.00 15.99 0.00 | No |
| 2009 | Nantucket Vermont | 7 0 | $20,993 0 | $47,948 $10,718 | $26,955 $10,718 | 918.5/864.5 | 40 0 | 253 32 | 23 8 | $63,678.87 | $54,830.00 3,706.87 5,142.00 | Yes |
| 2010 | Nantucket Vermont | 7 0[19] | $21,500 7,200 | $25,644 $13,178 | $4,144 $5,978 | 888.5/961 | 46 16 | 342 54 | 44 7 | $30,471.36 | $28,383.00 771.65 1,316.71 | Yes |
| | | | $128,462.00 | $511,361.00 | $382,899.00 | | | | | $293,350.76 | | |

[17] The expense deductions listed in the table include only the deductions claimed for cash expenditures and do not include depreciation.

[18] Claim amounts are as of petition date. The claims for 2003 through 2006 are asserted as secured claims. The claims for 2007 and 2008 are asserted as unsecured priority claims. The claims for 2009 and 2010 are asserted as administrative expense claims. In addition to the amounts allocated to specific years, as set forth in the table, the IRS also asserts a general unsecured claim for $13,847.70; this is a prepetition claim but is not otherwise allocated in the proof of claim to any particular tax year.

[19] The Condo was not rented in 2010, but the Shaws received income in 2010 for rental of that property in 2011.